NO.   95-387

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

IN THE MATTER OF R.B.O., D.R.O.,
R.I., G.M., T.M.,
        Youths in Need of Care.


APPEAL FROM:    District Court of the Second Judicial District,
                In and for the County of Silver Bow,
                The Honorable John W. Whelan, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Robert G. McCarthy; Dayton & McCarthy,
            Anaconda, Montana

        For Respondent:

            Ross P. Richardson; Henningsen, Vucurovich &
            Richardson, Butte, Montana


                            Submitted on Briefs:  March 7, 1996

                                      Decided:  July 22, 1996

Filed:

FILED

JUL 22 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

Justice Karla M. Gray delivered the Opinion of the Court.

Laura Ison (Ison) appeals from the judgment entered by the Second Judicial District Court, Silver Bow County, on its findings of fact, conclusions of law and order terminating her parental rights. We affirm.

We address the following issues:

1. Did the District Court err in terminating Ison's parental rights pursuant to § 41-3-609, MCA?

2. Was Ison denied due process of law by the District Court's reliance on reports submitted by individuals who were not subject to cross-examination?

Ison is the mother of R.B.O., D.R.O., R.I., G.M. and T.M. She has a long history of contact with the Montana Department of Family Services (DFS), now the Department of Public Health and Human Services. In 1989, DFS obtained a Temporary Investigative Authority (TIA) relating to Ison's care of her children. The children were placed in foster care and Ison participated in an informal treatment plan. The TIA was dismissed in January of 1990.

On January 22, 1990, DFS received a complaint that Ison was taking illegal drugs and leaving her children unattended. On February 15, 1990, she was arrested in Great Falls for felony theft. The children were placed in foster care and remained there until June 1, 1990, when they were placed with relatives in Butte. R.B.O., D.R.O. and R.I. were returned to Ison in September, and G.M. and T.M. in October, of 1991.

On April 3, 1992, Ison filed a complaint with DFS alleging that four of her children had been sexually abused. DFS provided

counseling for Ison and day care and counseling for her children. On June 30, 1992, DFS received a complaint, which was later substantiated, that Ison had left her children unattended. On October 5, 1992, DFS received another complaint alleging that Ison had left her children unattended; DFS determined that this complaint was not valid.

In October of 1992, Ison informed DFS that she did not have a residence for the children. G.M. and T.M. were placed in foster care, while the other three children remained at a residence in Butte. Ison left Butte for a week and, on her return on October 21, 1992, she took the children to stay with her at a local motel.

On January 13 and February 4, 1993, DFS received complaints that Ison's children had not been picked up from school; DFS determined that the complaints were valid. On February 12, 1993, Ison's parole officer informed DFS that Ison was in the Women's Transitional Center (Pre-Release Center) as the result of a parole violation. The children stayed with friends in Butte at that time, but on March 19, 1993, Ison informed DFS that the children needed placement. She entered into an agreement with DFS under which she agreed to temporarily place her children in foster care.

Ison later arranged for the children to reside with friends in Butte and, as a result, the children were removed from foster care on June 9, 1993. On July 1, 1993, the individuals caring for the children informed DFS that they could no longer do so. At that time, DFS petitioned the District Court for another TIA and the children were again placed in foster care, where they have

3

remained.  On August 16, 1993, the court found the children to be youths in need of care as defined in § 41-3-102, MCA.

While in the Pre-Release Center, Ison entered into a treatment plan with DFS which commenced on October 29, 1993, and ended, by its terms, on April 29, 1994.  The treatment plan was filed with, and approved by, the District Court.  On April 28, 1994, DFS moved for a continuation of temporary legal custody of the children based on a report by DFS social worker Dave Evans (Evans).  The Evans report noted that Ison had complied with the treatment plan, but recommended that the children remain in DFS' temporary custody for an additional sixty-day period while efforts toward reuniting Ison with her children continued.

On May 3, 1994, while Ison was living away from the Pre-Release Center, but subject to its day reporting program, Ison was again arrested and jailed for using methamphetamines in violation of program regulations.  Ison's parole officer informed DFS that she would be incarcerated for a minimum of 120 days at the Women's Correctional Center.  In an updated report dated May 6, 1994, which contained this information, Evans noted Ison's inability to provide proper care and supervision of her children; his concern about her ability to remain involved with her children was evident.  The District Court extended DFS' temporary legal custody of Ison's children for ninety days on June 3, 1994.

On August 18, 1994, DFS petitioned for termination of Ison's parental rights and permanent legal custody of her children. Counsel was appointed to represent Ison and the court continued

4

DFS' temporary custody of her children pending a hearing on the petition to terminate. The hearing was continued several times by motion or agreement of Ison. On December 6, 1994, DFS moved to dismiss the petition and continue temporary legal custody of Ison's children for an additional six months; Ison stipulated to the six-month continuation of temporary custody. The District Court continued DFS' temporary legal custody on December 14, 1994; it did not dismiss the petition to terminate Ison's parental rights.

Ison had returned to the Pre-Release Center from the Women's Correctional Center in late November of 1994 and, thereafter, DFS attempted to work on a new treatment plan for her. DFS ultimately presented the treatment plan, which retained the possibility of returning Ison's children to her care and custody, to Ison and asked her to sign it; she refused. On January 20, 1995, DFS moved the District Court for approval of the new treatment plan and a hearing was scheduled for January 27, 1995.

On or about January 21, 1995, however, Ison was again found to have used drugs and jailed. DFS was advised that she again would be sent to the Women's Correctional Center. Ison was scheduled to be released on August 21, 1995.

Following Ison's reincarceration, Evans concluded that another treatment plan would not be practical. Due to her repeated drug violations, he felt that the October 29, 1993, treatment plan clearly had been unsuccessful. Accordingly, DFS again petitioned the District Court for termination of Ison's parental rights on February 6, 1995; an amended petition was filed a week later.

5

At the beginning of the March 9, 1995, hearing on DFS' petition to terminate, Ison moved to dismiss the petition on the grounds that no court-approved treatment plan was in place as required by § 41-3-609, MCA. The District Court requested briefs on the issue and completed the hearing. Ison's motion to dismiss subsequently was denied.

On April 4, 1995, the court ordered a post-hearing supplemental evaluation of Ison and report by Dr. Mark Moser (Mozer), a clinical psychologist who had evaluated her in June of 1994. Ison moved to vacate the order, requesting the District Court to appoint some other suitable professional to perform the evaluation. The court denied Ison's motion. Mozer subsequently performed a psychological evaluation of Ison and submitted his report to the court.

On June 27, 1995, the District Court issued its findings of fact, conclusions of law and order terminating Ison's parental rights. Ison appeals

Did the District Court err in terminating Ison's parental rights pursuant to § 41-3-609, MCA?

Section 41-3-609(1), MCA, provides that a district court may terminate a person's parental rights if it finds that:

(c) the child is an adjudicated youth in need of care and both of the following exist:
(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and
(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

The District Court found that the three conditions set forth in

6

§ 41-3-609(1)(c), MCA, existed and, on that basis, terminated Ison's parental rights.

In Matter of D.H. (1994), 264 Mont. 521, 872 P.2d 803, we clarified the standards under which we review a district court's determinations in proceedings to terminate parental rights. We review a district court's factual findings to determine whether they are clearly erroneous. Matter of D.H., 872 P.2d at 805. Such a finding is clearly erroneous if it is not supported by substantial evidence; or, if so supported, the district court misapprehended the effect of the evidence; or, if so supported and the district court did not misapprehend the effect of the evidence, this Court is left with the definite and firm conviction that a mistake has been committed. Matter of D.H., 872 P.2d at 805 (citing Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). With the exception of a district court's conclusions involving the exercise of discretion, such as a determination that a child is abused and neglected, we review conclusions of law in termination of parental rights cases to determine whether they are correct. Matter of D.H., 872 P.2d at 805-06.

Ison contends that the statutory requirements of § 41-3-609, MCA, were not satisfied and, therefore, that the District Court erred in terminating her parental rights. We begin by addressing the District Court's findings under § 41-3-609(1)(c), MCA, in turn.

The District Court found that Ison's children were adjudicated youths in need of care. Ison does not dispute this finding and,

indeed, the record reflects that she stipulated that her children were abused, neglected or dependent youths at the time of the court's adjudication in August of 1993.

The District Court also found, under § 41-3-609(1)(c)(i), MCA, that Ison's court-approved treatment plan, which had expired on April 29, 1994, was not successful. We review the record to determine whether substantial evidence supports this finding.

Ison had been residing at the Pre-Release Center for at least eight months by the time the District Court approved the October 29, 1993, treatment plan. Both her involvement with law enforcement and her problems in providing a stable and appropriate home for her children resulted in large part from Ison's drug use.

The stated purposes of the treatment plan were 1) to facilitate the establishment of physical and emotional stability for Ison's children; 2) to assist Ison in establishing herself as a person capable of providing consistent and adequate care for her children; and 3) to provide DFS with information necessary to develop the most appropriate permanent plan for her children. The plan set forth numerous tasks for Ison, including individual and family counseling, weekly contact with her children and release of information from her family, mental health and chemical dependency counselors regarding her progress. Within two weeks of her release from the Pre-Release Center, the treatment plan required Ison to secure adequate housing for herself and her children; moreover, "during this time when Laura's children are returned to her care," she was to remain drug and alcohol free and her children were to be

8

supervised at all times. Evans testified, and these latter provisions of the **treatment** plan **clearly** contemplate, that the plan could not be successfully completed while Ison continued to reside at the Pre-Release Center.

Evans testified, and it is undisputed, that Ison complied with the applicable provisions of the court-approved treatment plan while residing at the Pre-Release Center. Ison's actual residence at the Pre-Release Center ended in approximately mid-April, 1994, when she moved into a house trailer in Butte, but she remained subject to the Pre-Release Center's day reporting program. According to Evans, Ison was living in adequate housing when the treatment plan expired by its terms on April 29, 1994; Evans' report filed April 28, 1994, recommended that DFS' temporary legal custody of Ison's children be continued for sixty days while Ison's ability to continue to establish a home environment, maintain counseling and work towards being reunited with her children in her home were monitored. Thus, the record is clear that, while Ison was making progress vis-a-vis the eventual return of her children to her care, the purposes of the treatment plan had not yet been accomplished at the time the treatment plan expired on April 29, 1994.

On May 3, 1994, less than a week after the treatment plan expired, Ison was arrested and jailed at the Butte-Silver Bow Jail for drug involvement; she subsequently was incarcerated at the Women's Correctional Center. Evans opined that, based on Ison's continued drug use and reincarceration, the treatment plan had not

been successful.  As a result, DFS petitioned to terminate Ison's parental rights.

For reasons not clearly reflected in the record, DFS later determined not to pursue the petition to terminate.  Instead, DFS tried to work toward a new treatment plan for Ison, still contemplating the possibility of the eventual return of her children to her care.  Ison refused to sign the plan.  DFS moved for court approval of the new treatment plan on January 20, 1995, and a January 27 hearing was scheduled.

On January 21, 1995, the day after DFS' motion, Ison was again found to have used methamphetamines.  Indeed, Linda Rogers (Rogers), Ison's chemical dependency counselor at the Pre-Release Center, testified that Ison discussed the possibility of doing so with her in advance and, notwithstanding her advice to Ison that such an action could have significant consequences with regard to her efforts to regain custody of her children, Ison went ahead with the drug use.  Ison was again jailed and subsequently returned to the Women's Correctional Center.  Evans concluded again that the October 29, 1993, treatment plan had not been successful and that another plan would not be practical.

Mary Kay Starin (Starin), the guardian ad litem for Ison's children, also testified at the hearing on DFS' petition to terminate Ison's parental rights.  In Starin's opinion, chemical dependency was Ison's central problem and Ison had not yet dealt successfully with that problem.  Thus, Starin opined that the treatment plan was not successful.

10

In addition to the testimony of Evans and Starin, Ison's own testimony at the hearing indicates that the treatment plan had not been successful. She admitted, although not consistently, that she knew one of the goals of the treatment plan was that she remain drug-free, and the record is clear that she had not done so in either May of 1994 or January of 1995. Ison conceded that her actions "in the last couple of years" had not been in the best interests of her children. She confirmed Rogers' version of the conversation between them the day before she used drugs in January of 1995. Ison admitted that she was addicted to methamphetamines and that she knew that continuing her drug use would have a negative effect on her children and her efforts to regain their custody and retain her parental rights. While tending to blame the lack of availability of a particular treatment plan for her continued dependency on drugs, Ison stated candidly that "[i]t was my choice and I chose to use."

The record before us contains more than substantial evidence in support of the District Court's finding, pursuant to § 41-3-609(1)(c)(i), MCA, that Ison's treatment plan had not been successful. Moreover, the testimony and reports discussed above also constitute substantial evidence in support of the District Court's finding, pursuant to § 41-3-609(1)(c)(ii), MCA, that Ison's condition was unlikely to change in a reasonable time. The court did not misapprehend the evidence in these regards and we are not left with a definite and firm conviction that a mistake has been committed. Thus, we conclude that the District Court's findings on

11

the three conditions required by § 41-3-609(1)(c), MCA, before parental rights can be terminated are not clearly erroneous.

Ison argues, however, that the District Court erred as a matter of law in terminating her parental rights because (1) there was no court-approved treatment plan in existence after April 29, 1994, and (2) the court's review of a treatment plan existing only under a dismissed petition for termination of parental rights allows consideration of matters too remote to serve as a basis for termination. She cites no authority for either proposition and, as a result, we address her arguments only briefly.

Ison's first argument appears to be that her parental rights could not be terminated because no court-approved treatment plan existed after the April 29, 1994, expiration of her treatment plan and, therefore, the statutory requirement of a court-approved treatment plan was not met. It is true that § 41-3-609(1)(c)(i), MCA, requires an appropriate and court-approved treatment plan. However, nothing in the statute requires, or even suggests, that a treatment plan must be in effect at the time proceedings to terminate parental rights are begun or completed. Indeed, from a practical standpoint, such a requirement would preclude terminations because the parent could always assert that he or she still had an opportunity to successfully comply.

Moreover, we recently have held that treatment plans can be found to be unsuccessful after the plan is completed. In Matter of S.C. (1994), 264 Mont. 24, 869 P.2d 266, the mother complied with two treatment plans which had been approved by the district court;

12

following completion of the treatment plans, however, the mother again became involved with drugs and attempted to commit suicide. In affirming the district court's determination that the treatment plan had not been successful, we stated:

> It is well established that a parent must not only comply with the treatment plan, but the treatment plan must also be successful. [Citation omitted.] After reviewing the record in this case we conclude that the District Court properly determined that the treatment plans were appropriate and they were complied with, but were not successful in resolving M.C.'s long-term mental illness problems.

Matter of S.C., 869 P.2d at 269.

In the instant case, one of the goals of the treatment plan was that Ison remain drug-free. It is undisputed that Ison complied with the October 29, 1993, treatment plan while it was in effect through April 29, 1994. However, mere days after the expiration of the treatment plan, and before her children were returned to her, Ison again used drugs and was reincarcerated. Ison again tested positive for drug use in January of 1995, while residing at the Pre-Release Center, whereupon she was returned to the Women's Correctional Center. Thus, given the goals of the treatment plan, it is clear that Ison's continued refusal to refrain from drug use is sufficient to establish, under § 41-3-609(1)(c)(i), MCA, that a "treatment plan that has been approved by the court . . has not been successful[.]"

Ison also argues that, upon the dismissal of DFS' original petition to terminate parental rights based on the lack of success of the expired treatment plan, the District Court erred in not requiring a new treatment plan. Ison's argument is based on a

13

misreading of the record.

The record reflects that on December 6, 1994, DFS moved to dismiss without prejudice its August 18, 1994, petition to terminate Ison's parental rights; as part of the same motion, DFS requested a six-month extension of its custody of Ison's children. Ison stipulated to the continuance of DFS' custody of her children and, on December 14, 1994, the District Court granted that continuation of custody. The District Court did not dismiss the August 18, 1994, petition to terminate. One week later, Ison again used drugs and DFS proceeded with termination proceedings rather than continuing its efforts toward obtaining court approval of a new treatment plan.

Thus, contrary to Ison's assertion, DFS' original petition to terminate was not dismissed. On this record, therefore, the issue of whether dismissal of a petition to terminate parental rights, where the petition had been based on an alleged lack of successful completion of a treatment plan, necessitates a new court-approved treatment plan and subsequent statutorily-required proceedings prior to termination of parental rights is not before us.

Finally, Ison's related argument that the lack of a new treatment plan permitted the District Court to consider matters "too remote" is without merit. Ison's drug dependency was a long-term problem impacting directly on her ability to successfully parent her children. She could not, or would not, resolve the problem, as evidenced by two incidents of drug use over an approximately eight-month period while she was still subject to

14

Pre-Release Center drug monitoring. There is nothing "remote" about Ison's repeated drug use here; it is strong evidence, as was the case in Matter of S.C., that the treatment plan was not successful.

We hold that the District Court did not err in terminating Ison's parental rights pursuant to § 41-3-609(1), MCA.

> Was Ison denied due process of law by the District Court's reliance on reports submitted by individuals who were not subject to cross-examination?

Ison argues generally that the District Court denied her due process of law by relying on reports contained in her file without requiring the authors of those reports to testify, and be subjected to cross-examination, at the hearing on DFS' petition to terminate her parental rights. Her primary contention is that the District Court erred in ordering a post-hearing psychological evaluation by Moser and in relying on Moser's report from that evaluation in its findings of fact and conclusions of law. Ison also makes a passing reference to the District Court's allegedly erroneous reliance on reports from the Pre-Release Center.

We repeatedly have warned district courts that the receipt and consideration of even pre-hearing reports in proceedings such as those to terminate parental rights can have severe due process consequences. See, e.g., Matter of Moyer (1977), 173 Mont. 208, 211, 567 P.2d 47, 49. The possibility of error is great when trial courts rely on reports not supported through examination of their authors by the parties. Matter of M.F. (1982), 201 Mont. 277, 287, 653 P.2d 1205, 1210.

15

Here, however, Ison did not raise her due process concerns relating to the District Court's post-hearing order for an evaluation and report by Mozer, and the court's reliance on Mozer's report, in the District Court. The record reflects that Ison recognized, and availed herself of, the opportunity to object to the court's post-hearing order; indeed, she moved to vacate the order requiring the psychological evaluation and corresponding report. The basis of her motion, however, was not the due process argument she attempts to raise here that the author of the report would not be subject to cross-examination. Rather, Ison objected to Mozer performing the evaluation, alleging bias, and merely requested that a different professional perform the evaluation.

We have long refused to address issues raised for the first time on appeal. Lane v. Smith (1992), 255 Mont. 218, 221, 841 P.2d 1143, 1145. Ison's due process argument relating to her inability to cross-examine Mozer prior to the District Court relying on his post-hearing evaluation report is raised for the first time on appeal and after a recognized opportunity--indeed, an exercised opportunity--to object. We refuse to address Ison's argument.

Ison also makes a passing reference to the District Court's error in relying on reports by Michelle Jenicek, her primary counselor at the Pre-Release Center, apparently urging the same due process argument set forth above. The record reflects, however, that Ison was not only aware of the reports but that her counsel cross-examined Evans with regard to the contents of those reports. Nor did she object to the presence of the reports in the file or

16

the District Court's reliance on them. Indeed, **Ison's** counsel stated that "[r]ather than going through the details of each report, I'd ask that the Court review those individual reports."

A party cannot assert error on appeal with regard to a matter in which it acquiesced in the trial court. In re Pederson (1993), 261 Mont. 284, 287, 862 P.2d 411, 413; In re Marriage of West (1988), 233 Mont. 47, 51, 758 P.2d 282, 285. Here, **Ison** not only acquiesced in the District Court's reliance on the Pre-Release Center reports, she actively encouraged it. As a result, we will not address her assertion of error in this regard.

Affirmed.

_____
Justice

We concur:

_____

_____

_____
Justices

17